Let's take up People v. James Branch Josette Skelnick, Office of the State Appellate Defender I'm here today on behalf of James Branch. James Branch was convicted after a jury trial of three counts of predatory criminal sexual assault and sentenced to a total term of 45 years in prison. I know we have time constraints today, so for purposes of today's argument, I would like to focus on the issue relating to prosecutorial misconduct and ineffective assistance, and if time permits, to briefly talk about the suppression issue you raised in the supplemental brief. James Branch's convictions in this case were based on gossip, innuendo, and outright lies. The amount of prosecutorial misconduct and overreaching in this case is enormous, so much so that it's difficult in the time we have to detail each and every instance. Or to detail each and every instance where defense counsel failed to protect his client. Defense counsel effectively made no objections to any of the improper evidence or improper insinuations and filed no post-trial motion at all, preserved no issues for review. One of the worst instances on both ends, on the prosecutor's and defense counsel's part, was with respect to the videotape interrogation of Mr. Branch that Detective Husted took. It was a 30-minute interrogation, and during this entire interrogation, everyone agreed that Mr. Branch had consistently maintained his innocence. Husted admitted at trial that during interrogations, he lies to suspects because he thinks that's the way to get suspects to confess. Unknown to the jury, though, and with help from the prosecutors and no help from defense counsel, Husted also misrepresented at trial what Mr. Branch actually said during the videotape interrogation. Husted claimed that the defendant admitted to him he had taken L.D. alone to his trailer, where L.D. said this abuse had occurred. And essentially, the prosecution was treating this alleged statement as an admission by the defendant. The prosecutor not only allowed Husted to testify to this statement, but during opening statements, she promised the jury that they would hear evidence that the defendant had admitted taking L.D. to his trailer alone. And then during the defense case, the prosecutor cross-examined the defendant's niece, Andrea Correa, asking if she was aware, are you aware that, whether James has ever taken L.D. to his trailer alone? And she said, no, I'm not aware of that. The prosecutor then said, would it surprise you to learn that he admitted to Detective Husted that he took L.D. to his trailer alone? And what you can even read into the record, a very stunned response from his niece saying, yes, that would be very surprising, and forced her to stumble around on the stand for explanations, innocent explanations as to why Mr. Branch may have taken L.D. to his trailer alone. The overriding problem, of course, is that that never happened. He never made a statement during this videotaped interrogation or at any time that he took L.D. to his trailer alone. He asked that the record be corrected to show that, in fact, no, that statement was never made. He turned it into a credibility issue between him and the detective, and not an issue of false testimony being presented to the jury. This was significant because, one, it was presented in a manner that made it seem like an admission by the defendant when that had, in fact, never happened. And two, I think it's important to consider that had the jury known that Detective Husted was lying or at least misrepresenting when he said the defendant made this statement to him during the interrogation, they may not have believed the detective as well when the detective claimed on the stand that he took L.D. to his trailer alone. And that the defendant said to him when he was told he was under arrest, I guess you found my DNA on that girl, which conveniently was the only incriminating statement, alleged incriminating statement of the defendant that wasn't recorded. So the only time when he doesn't have a record of it, the detective's claiming the defendant made what he believed was an incriminating statement. In fact, the prosecutor brought out the detective's opinion that he believed this statement, which isn't recorded anywhere, was an incriminating statement. With respect to the state's argument that this was just inadvertent by the prosecutor, that she was just relying on what her witnesses were saying on the stand, I think this court should look at that with a huge grain of salt. First of all, there are so many different instances when the prosecutor refers to this. It was one of the key points of her opening statement and her examination of her witnesses and cross-examination of the defense witnesses. It was purposely elicited. It looks from the record that what defense counsel was using was a transcript from the videotape interrogation. And I want to remind the court, this transcript had been prepared by the state itself. I think it may have even been Ms. Walker who prepared the transcript, because there were several continuances where the defense was waiting for the preparation of this transcript. This is a case where the defendant was being charged with three Class X offenses, six-year minimum. He's got a 45-year sentence on this, very serious charges, very serious allegations. To think that the prosecutor, relying on something she's treating as an admission, would not take the time to go through the transcript she herself prepared or to look at the 30-minute video that was there and not discover that this statement wasn't there. If she didn't do that, that's gross incompetence on her part and certainly a violation of the defendant's due process rights when they're presenting testimony to the jury that isn't true and the jury's never advised of the falsity of that testimony. Numerous other instances, just briefly, of prosecutorial misconduct. Attacking the defendant's character by raising insinuations that he had a past history that involves sexual offenses against other children. Asking the defense witness, has he befriended other little girls? Are you aware of his past? Are you aware if he's befriended other little girls? The state asking its witnesses to give their opinions on the credibility of L.D., on the credibility of her accusations. In one instance, actually, defense counsel was the one who brought out on cross a witness's opinion that L.D. was credible. The state failed to perfect impeachment when disputing Mr. Branch's claim that he had made a report to DCFS of L.D.'s mistreatment by her parents in 2009. The prosecutor gave her own opinion during closing arguments of L.D.'s credibility. This was all extremely, and again, defense counsel didn't take any steps to protect his client from any of this improper impeachment or innuendos. It was extremely prejudicial because this entire trial revolved around the issue of credibility. Despite what Detective Husted told the defendant, lied to him during the interrogation about whether there was DNA found. There was, in fact, no DNA in this case. There was no physical evidence, other physical evidence, no scientific evidence. There was also no evidence that L.D. was uneasy or acted strangely around the defendant. The defendant's defense was that if she had been abused, it likely was by a relative of hers, Teddy, who, in fact, had moved into the family home a few months before L.D. was removed from her home. And I think it's curious that Cheryl Woodham testified in court that L.D. volunteered to her when she asked, that Teddy had not done this. But if you look at the videotaped interview of L.D., which is in the record, Cheryl Woodham said to L.D., has someone else besides James ever tried to make you touch them? And her response was, no, no, no, no, no, not Teddy. Nobody had mentioned Teddy, and yet this little girl is bringing this up in response. It's also, I think, important to consider that L.D. testified, we're not challenging the trial court's ruling on this, but L.D. testified via closed-circuit TV. So she was never face-to-face with James Branch, and I think it's a lot easier for someone to stick to a story when they're not face-to-face with the person they're accusing. I think I have one minute left. Twenty seconds. Okay. I guess I will not be able to get into the suppression issue. I would just say that what the detective did when he announced to James Edwards that he was under arrest was a functional equivalent of an interrogation, because essentially what he was saying and everything leading up to that led to him inducing James. Okay. Inducing James to believe that we're doing a DNA test and your arrest depends on the results of the DNA test. So when he said you're under arrest, he was effectively saying to the defendant there was a match of your DNA, and that's something that he knew would be likely or that he was hoping would elicit an incriminating response. So we would ask their honors for a new trial, and the defendant's statement be suppressed at the new trial. Thank you, Counsel. Thank you. I'll argue for the State. May I please report, Counsel? I'm Luke McNeil with the Appellate Prosecutor's Office. I know there's a lot of issues in this case and not much time, so if there's a specific issue that there's extensive questioning on, feel free to fire away at any point. I will stand on the sufficiency of evidence argument that wasn't brought up here. As for prosecutorial misconduct, it's good to establish the timeline. This video was in the record only because it was played at the defendant's motion to suppress hearing. This was seven months earlier than the trial. At this motion to suppress hearing, Detective Husted also testified at this hearing, so this would have been the same day the video was played. Detective Husted testified with this alleged mistake the same at this hearing, this motion to suppress hearing. He said, yes, the defendant admitted to taking L.D. to his trailer. There was no objection. The trial court didn't correct anyone. The prosecution didn't correct anyone. The defense counsel didn't object. This was the day of watching this video. The trial was seven months later. If nobody caught this supposedly very significant part of the state's case in chief at the motion to suppress, it's unrealistic to think that not only the prosecutor knew about that this was inconsistent and incorrect from the video, but that she relied upon that. Of course, the prosecutorial misconduct burden is always on the defendant. Here, the record reflects that this is more likely a mistake by Detective Husted in his recollection of the video, especially when he testified consistently twice at the motion to suppress hearing and at the trial that the defendant admitted to taking L.D. to his trailer. This is small in comparison to the victim's actual testimony at trial where she said, yes, the defendant did these things, and the defendant's much more damaging voluntary statement of, I guess they found my DNA on that girl. This was clearly the more damaging evidence against the defendant, not this insignificant admission, although, of course, the prosecutor did bring it up in opening and closing. However, that was Detective Husted's testimony at the trial, and Moser corroborated that testimony. As far as the prosecutor knew, this was the evidence at the trial. If everybody would remember exactly what their, if Detective Husted remembered exactly what his interrogation questions and answers were in that video, it would have been a lot easier for everyone because, like I said, it's not that big a more significant or damaging evidence against the defendant. But it certainly doesn't rise to the level of prosecutorial misconduct. A lot of the cross-examination allegations also stem from that video that, asking certain witnesses, would you be surprised if the defendant admitted to this or whatever. The questions could have easily been, would you be surprised if the defendant admitted to taking LD along anywhere to his niece's house or wherever. It's not that significant and doesn't reflect prosecutorial misconduct. As for the other improper questions on cross-examination, those were objected to by defense counsel. As far as defense counsel being sort of an inactive member at this trial, that's just not the case. The record doesn't reflect that. Defense counsel objected to the questions about the defendant's past. The trial court agreed with him. Outside of the presence of the jury, the prosecutor moved on. Defense counsel objected to questions on whether the defendant made friends with little girls in the past as well. So again, if we just established that any sustained objection on the prosecutor's cross-examination is misconduct, that would basically swallow the prosecutorial misconduct rule. And most importantly, as far as the prosecutorial misconduct issue, the defendant was prejudiced. Even assuming prosecutorial misconduct, the evidence against the defendant was overwhelming. We had the victim testify that he indeed did this. We had a caseworker testify that the victim's allegations were consistent, that the defendant did this. And this so-called prosecutorial misconduct, really even assuming error, was harmless and beyond reasonable doubt. As for the Krenkel hearing argument, the original record didn't show the defendant's statement of allocution. It was unintelligible to the court reporter. The appellate counsel apparently tracked down a written statement by the defendant, a 12-page handwritten, single-spaced statement that the defendant says was his statement of allocution. That's in the record now, a supplement to the record. Also was a fax from trial counsel saying, yes, this looks like his defendant's statement of allocution. That's not a bystander's report, I would argue, but the record is insufficient to show that trial court was improper in not triggering the Krenkel inquiry here. However, if this court does find that that was indeed his statement of allocution, I cited People v. Taylor as additional authority. In that case like this one, there was no correspondence, direct correspondence with the trial court, no motion filed that the counsel was ineffective. Instead, it was in the statement of allocution. There, and even more so here, both statements were long and rambling and amenable to more than one position. The defendant's statement here was basically a closing argument. He said he disagreed with the strategic choices of counsels. However, in the next breath, he says, I want this counsel to file my motion for a new trial as soon as possible. If he was really making an ineffective assistance of counsel claim, it would be illogical for the same counsel to represent him on a motion for a new trial, especially if it's the defendant's wishes. This clearly wasn't enough sufficient to trigger the Krenkel inquiry pursuant to People v. Taylor, even if this court does find that that was his statement of allocution. As for the motion to suppress, the easiest way to disclose of this argument that was in the supplemental briefs is that it was harmless error. The defendant invoked his right to counsel moments before the interview ended. He instantly then said, and you won't find my – they won't find my DNA, so that's one good thing. Of course, this is a reinitiation of a generalized discussion of the investigation. I cited People v. Woolley, the Supreme Court case that says whether the defendant said, I killed him or I didn't do it, the defendant's statement could be found through events of willingness to continue a generalized discussion. This is, of course, different words to say I didn't do it. And defendants say, the video is in the record. You can look at it. Defendant, the next thing he said after I want a lawyer was this. However, even more importantly, the defendant doesn't say anything of substance or discriminating after that. There's a couple more questions where the defendant denies, and then he says, I remain silent, and the interview is over. Defendant does try to, on this appeal, argue or try to intertwine this spontaneous statement he says as he's being arrested as part of his Miranda violation. However, that was 30 minutes later. Defendant was in the room by himself, but 30 minutes later, Detective Husted comes back, tells him he's under arrest. There's no questions pending. He wasn't asked any questions. He says, you're under arrest. Defendant then says, I guess you found my DNA on that girl. This was clearly, even all the way back to Miranda, Miranda says a voluntary and spontaneous statement is, of course, admissible even if no Miranda warnings are given at all or inadequate Miranda warnings. So this was clearly admissible and not part of the interrogation of the defendant. And the court has no questions. Thank you. Thank you, Counsel. Rebuttal argument. Thank you, Your Honor. I did receive yesterday a copy of People v. Taylor, which the state is moving to cite as additional authority. That case has no resemblance to our case. In that case, the Supreme Court said the defendant never really made any allegations of ineffective representation by his attorney. I would point this court to the defendant's letter, which his own attorney said was a statement he read at elocution. And starting on page five and through to page eight, he starts out by saying, I cannot help but feel that Mr. Lowell Tyson has failed to provide me with effective representation in this case due to his incompetence. And goes on as to various failings on defense counsel's part, including not objecting, not filing a post-trial motion, not putting out evidence to rebut the state's evidence. So he certainly raised an allegation of ineffective assistance in this case that was never addressed. With respect to the missing the nonexistent statement, I just find it remarkable to think that an attorney who's preparing for a trial on three Class X charges would not review the evidence. Especially when you're treating something as an admission, you better be sure that that admission actually exists. And if this prosecutor was so neglectful or incompetent that she didn't check her evidence, certainly the defense counsel then was incompetent for not telling the jury or asking that the jury be advised that this statement did not actually exist. Because it appears he was actually using the transcript of the videotaped interrogation when he was examining his own client. So he should have told the court at that time, Your Honor, please let the record reflect and let the jury be admonished that this statement was never made. And that went a long way toward damaging his client's credibility and bolstering Detective Husted's credibility. With respect to the question of the alleged statement he made post-arrest, the state says that he reinitiated conversation by saying, My DNA's not going to match. The statement, to be a reinitiation, the statement has to convince a willingness and a desire by the defendant to engage in a generalized discussion of the investigation. This defendant was simply saying, I know the DNA's not going to match because I'm innocent. The proper response if the detective wanted to treat this as a reinitiation, obviously he did because then he started making suggestions about, well, maybe we already have a match. How do you know we don't already have a match? He was doing the very thing that Edwards is trying to protect against, badgering the defendant to try and get him to make a statement, incriminating himself. And the fact, I think it's more apparent here, that this statement, My DNA is not going to match, was not a willingness to engage in a generalized discussion because after Detective Husted kept peppering him and peppering him with questions and suggesting they already had this incriminating evidence, he invokes his right to counsel again. So obviously he's being subject to badgering by the detective. And if you look at everything that happened from his first invocation of his right to counsel until the time he allegedly made this statement, the detective was telling him, your arrest is going to depend on the outcome of this DNA test. In fact, the prosecutor even suggested that in closing argument. The detective goes out like he's going to get the results of the test. He comes in, he gives him the test, he takes the swab out. He says, the defendant says, am I under arrest? And he says, well, let's see. The prosecutor said, he made it seem as though he was going out to get the results of the test. So again, when he comes back and says to the defendant, you're under arrest, he's telling him, you are guilty. We have evidence. The DNA is a match. And I think it's significant in Wooley and all the other cases where they found statements were admissible. The officer re-admonished the defendant of Miranda rights. This detective never, ever re-admonished Mr. Branch of his Miranda rights. Never even said to him, you know, you invoked your right to counsel, do you want to speak to us? Never asked him. So certainly, there's no waiver shown in here. There's no intentional relinquishment of his rights. So again, we would ask for a new trial for Mr. Branch, and we would ask that the statement he allegedly made be suppressed. Counsel, thank you. Thanks to both of you for your arguments. We'll take this case under advisement.